DAVID A. HUBBERT
Deputy Assistant Attorney General

GREGORY L. MOKODEAN (OH Bar No. 0086880)
Gregory.L.Mokodean@usdoj.gov
Phone: (202) 307-6554
HARRIS J. PHILLIPS (MA Bar No. 675603)
Harris.J.Phillips@usdoj.gov
Phone: (202) 616-1906
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 7238, Ben Franklin Station
Washington, DC 20044
Fax: (202) 514-6770

TRACY WILKINSON
Acting United States Attorney
THOMAS D. COKER
Assistant United States Attorney
Chief, Tax Division
GAVIN L. GREENE (Cal. Bar No. 230807)
Assistant United States Attorney
    Federal Building, Room 7211
    300 North Los Angeles Street
    Los Angeles, California 90012
    Telephone: (213) 894-4600
    Facsimile: (213) 894-0115
    E-mail: Gavin.Greene@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>JOHN C. DALTON, IV,<br>JOHN C. DALTON, V, and<br>MATTHEW J. DALTON,<br><br>    Defendants. | Case No. 8:21-cv-140<br><br>COMPLAINT |

Plaintiff United States, for its complaint against Defendants John C. Dalton, IV, John C. Dalton, V, and Matthew J. Dalton, alleges the following:

**Nature of the Action**

1. In this action, the United States seeks money judgments against Defendants John C. Dalton, IV, John C. Dalton, V, and Matthew J. Dalton because each received, directly or indirectly, fraudulently transferred funds from Dalton West Coast, Inc. ("DWC") related to an abusive tax shelter that left DWC with insufficient assets to pay its 2006 federal income tax liability.

2. This action has been requested and authorized by the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury of the United States, and is brought at the direction of a delegate of the Attorney General of the United States, pursuant to 26 U.S.C. § 7401.

**Jurisdiction and Venue**

3. The Court has jurisdiction over this action under 28 U.S.C. §§ 1340 and 1345, and 26 U.S.C. §§ 7401 and 7402(a).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this judicial district. Moreover, a substantial portion of the conduct alleged in this complaint occurred in this judicial district.

**Parties**

5. John C. Dalton, IV ("John IV") resides in Yorba Linda, California and is subject to this Court's jurisdiction. John IV was a shareholder and director of DWC (the corporate taxpayer, described in paragraphs 8 through 10 below, which failed to pay its 2006 federal income tax liability) and served as its President and Chief Financial Officer while it was conducting business. John IV originally owned 100 percent of DWC's stock. As of January 1, 2006, John IV owned 37 percent of DWC's stock. John IV helped direct the fraudulent transfer of DWC's assets to himself and the other Defendants.

6. John C. Dalton, V ("John V") resides in Yorba Linda, California and is subject to this Court's jurisdiction. He is Defendant John IV's son and Defendant Matthew Dalton's brother. John V was a shareholder and director of DWC, and he served as its Vice President and Treasurer while DWC was conducting business. John V owned 31.5 percent of DWC's stock as of January 1, 2006. John V helped direct the fraudulent transfer of DWC's assets to himself and the other Defendants.

7. Matthew J. Dalton ("Matthew") resides in Los Angeles, California and is subject to this Court's jurisdiction. He is Defendant John IV's son and Defendant John V's brother. Matthew was a shareholder and director of DWC, and he served as its Secretary while DWC was conducting business. Matthew owned 31.5 percent of DWC's stock as of January 1, 2006. Matthew helped direct the fraudulent transfer of DWC's assets to himself and the other Defendants.

## Dalton West Coast, Inc.'s Unpaid 2006 Tax Liability

8. In 2000, John IV incorporated DWC in California as "A Certified Document Destruction Company." Prior to 2006, DWC was in the document destruction business, including providing document-shredding services to corporate clients throughout southern California.

9. DWC was organized as a "C" corporation, which meant that it was responsible for filing and reporting its own federal income taxes and paying those taxes.

10. By 2005, DWC had acquired assets. DWC owned tangible assets such as motor vehicles (including trucks equipped for shredding), shredding and baling machines, secured shredding boxes, office equipment such as computers and desks, and warehouse equipment such as generators and trailers. DWC also owned intangible assets such as goodwill and its customer list. Finally, DWC had outstanding accounts receivables due from its customers. Collectively, DWC's assets were worth approximately $30 million. Because DWC had paid relatively little to acquire its assets, most of the value was untaxed built-in gains, which meant that DWC would owe income taxes if it sold its assets.

11. In 2005, John IV and John V were considering selling DWC's assets and distributing the profits of DWC's sale to themselves and Matthew.

12. On October 21, 2005, DWC agreed to sell substantially all of its non-cash assets, as identified in paragraph 10 above, to an unrelated corporate entity known as Cintas for at least $31.3 million. Defendants all signed the Asset Purchase Agreement as shareholders of DWC. John IV also separately signed the agreement as President of DWC. Cintas did not purchase DWC's cash on hand, employment agreements, corporate records, and six pieces of large equipment, but these assets were of relatively negligible value.

13. Under the DWC-Cintas Asset Purchase Agreement referred to above, Cintas paid the bulk of the purchase price on a closing date. In addition to the closing payment, Cintas agreed to pay DWC, after the closing, certain additional payments (the "Future Cintas Payments").

14. Under the Asset Purchase Agreement referred to above, DWC (and its shareholders) agreed not to compete in the document destruction industry for five years. Because document destruction was DWC's only line of business, it ceased business operations after the asset sale.

15. Therefore, after the asset sale referred to above, DWC's remaining assets were substantially comprised of cash on hand that it received from Cintas plus the Future Cintas Payments.

16. On or about November 22, 2005, Cintas paid approximately $24,050,025.95 to an escrow account, and, on or about January 4, 2006, those funds were transferred to DWC.

17. As a result of its asset sale, DWC incurred a large federal income tax liability for tax year 2006, along with a corresponding state income tax liability. These federal and state income taxes comprised substantially all of DWC's liabilities.

18. Each Defendant knew that DWC incurred a large federal income tax liability as a result of the asset sale between Cintas and DWC. In early 2006, the accountant for

4

DWC and Defendants estimated that DWC would owe federal income tax of $9,372,374, plus state income taxes, for tax year 2006, as a result of the asset sale between DWC and Cintas.

**Defendants Used a "Midco" Tax Shelter to Evade Payment of DWC's 2006 Income Taxes and Increase their Shares of DWC's Distributed Assets**

<u>Defendants Agreed to Execute a Midco Tax Shelter</u>

19. Defendants knew that, when DWC sold its assets to Cintas and ceased operating, DWC was going to be a corporate shell that had approximately $24 million in cash on hand. Rather than causing DWC to set aside enough money to pay its taxes, Defendants sought to each receive a greater distribution of DWC's assets as a result of avoiding payment of DWC's taxes.

20. Defendants began negotiations with an entity known as Private Capital Resource Group, Inc. ("PCRG") around a transaction whereby, in effect, DWC would distribute its assets as follows: (a) Defendants would receive an amount of DWC's assets equal to the value of their stock and (b) instead of using the rest of DWC's assets to pay DWC's tax liabilities, Defendants and PCRG would roughly equally share the remainder of DWC's assets.

21. In form, PCRG proposed to use a shell entity called CDD Holdings LLC ("CDD Holdings") to purchase DWC's stock.

22. Defendants received a letter of intent on PCRG letterhead, nominally from CDD Holdings, dated the same day CDD Holdings was incorporated (February 6, 2006). The letter of intent proposed that Defendants would sell their interests in DWC and that they collectively would receive $18,836,500. The $18,836,500 distribution was based on a projection (attached to the letter of intent) that DWC would hold total assets of $24,050,026 in cash on hand and had total liabilities of $10,426,998 in accrued tax liabilities.

23. Based on the projection attached to the letter of intent referred to above, if Defendants had caused DWC to pay its 2006 federal and state tax liabilities, DWC

5

would have had enough cash on hand left such that Defendants would have received approximately $13.6 million. Thus, based on this projection, DWC's stock would have been worth approximately $13.6 million.

24. But instead of paying DWC's 2006 federal and state income taxes and collectively receiving a distribution of $13.6 million, Defendants' plan would transfer DWC's cash through CDD Holdings as a middle company. Defendants' plan would enable them to obtain more than $18.9 million, which was a premium of more than $5 million over the value of DWC's stock (based on the projections in the letter of intent). This $5 million premium reduced the amount of DWC's money available to pay its 2006 federal income tax liability.

25. The transaction described above was an abusive tax shelter designed to increase Defendants' share of DWC's assets (*i.e.*, its cash) by shifting responsibility for causing DWC to pay its taxes to the shell entity CDD Holdings. This tax shelter is known as an "intermediary transaction," a "middle company" transaction, or a "Midco" transaction.

Defendants Prepared for the Tax Shelter by

Distributing DWC's Future Assets to Themselves

26. Because, as explained above, the Midco tax shelter required DWC to be a shell holding only a pre-determined amount of cash assets and tax liabilities, Defendants needed to remove all of DWC's other assets and liabilities from the entity.

27. Accordingly, immediately prior to executing the Midco transaction described above and below, Defendants transferred DWC's non-tax liabilities to themselves or their other businesses.

28. Also immediately prior to executing the Midco transaction described above and below, Defendants transferred DWC's most significant asset (other than the cash to be used in the Midco tax shelter) to themselves. Specifically, on March 22, 2006, Defendants signed—John IV on behalf of DWC as its President and all three Defendants on behalf of themselves as transferees—a document entitled "Assignment" which caused DWC to transfer to Defendants collectively the right to collect the Future

1 Cintas Payments directly from Cintas. DWC received no consideration in exchange for
2 this transfer. Later in 2006, Defendants collectively received $8,416,212 from Cintas.
3 Cintas paid approximately $8 million (in sum) to an investment account held jointly by
4 Defendants and approximately $470,000 to an account solely in John IV's name.

29. DWC also owned assets that Defendants did not formally transfer to themselves (*i.e.*, leftover equipment of limited value and bank accounts with relatively small balances), and Defendants retained control of those assets even in the absence of any written basis for holding title to them, as is further described below.

### Defendants Executed the Midco Tax Shelter

30. On or about March 22, 2006, Defendants and CDD Holdings (the shell entity, described in paragraphs 21 through 22 above) executed and implemented the Midco tax shelter transaction. Defendants signed a document entitled "Share Purchase and Sale Agreement" and caused DWC to transfer $24,227,070 to an escrow account for CDD Holdings. The same escrow account transferred $18,885,584 to Defendants.

31. Thus, in substance, DWC paid approximately $18.89 million to Defendants and its remaining $5.34 million of cash on hand to CDD Holdings.

32. In the Share Purchase and Sale Agreement, Defendants acknowledged that DWC held assets of $24,227,070 and tax liabilities of $10,682,972. Therefore, DWC's stock was worth about $13.54 million. Because Defendants received $18.89 million instead of the $13.54 million value of the stock, this abusive Midco tax shelter allowed Defendants to fraudulently collect $5.34 million more than DWC's actual value.

33. In effect, Defendants and CDD Holdings evenly split the $10.68 million "profit" they expected to generate from evading payment of DWC's federal and state income taxes for tax year 2006.

### DWC's 2006 Federal Income Tax Liability Went Unpaid

34. For tax year 2006, DWC had a capital gain of $26,690,725 from its asset sale transaction with Cintas, but it did not pay the resulting federal income tax.

## The Midco Tax Shelter Lacked Economic Substance
## Except for its Sole Purpose: Tax Avoidance

35. In November 2005, Defendants had caused DWC to sign a non-competition agreement, under the terms of its asset sale with Cintas, precluding it from operating its document destruction business. After January 6, 2006, DWC had no operations, no employees engaged in operations, no ongoing income, and no assets it could use to operate. So by the time of the Midco tax shelter, DWC had no business PCRG could have purchased and operated. Because DWC had no business operations to be purchased, the purported "stock sale" lacked economic substance.

36. For both Defendants and PCRG, the use of the Midco tax shelter could not possibly have resulted in a non-tax profit. Instead, the transaction was profitable to them only if they were able to avoid DWC's tax liability, which they sought to do by purporting to transfer responsibility for that tax liability to an entity that would not pay the tax. For this reason, the Midco tax shelter lacked a non-tax business purpose for all parties involved.

## Defendants Had at Least Constructive Knowledge that
## CDD Holdings and PCRG Did Not Intend to Pay DWC's 2006 Taxes

37. Defendants knew (or should have known) that DWC's taxes would go unpaid, for the reasons described below, as a result of the Midco tax shelter described above.

38. Defendants were aware of the following circumstances that should have led them to inquire further into whether, because of the Midco tax shelter, DWC's 2006 federal income tax liability would go unpaid:

   a. Defendants knew that, they were "selling" DWC's stock for $5.34 million more than it was worth. Defendants knew that the funds to pay DWC's more-than-$10 million of 2006 income tax liabilities could not be taken from DWC's remaining $5 million of cash on hand after $18.9 million was paid to Defendants.

   b. Defendants could not have expected the funds to pay DWC's 2006 federal income tax liability to arise out of DWC's business after the Midco tax shelter,

because DWC had none. Defendants knew that PCRG's "offer" to buy DWC's "stock" through CDD Holdings, as set forth in the letter of intent dated February 6, 2006, was contingent on DWC's having cash, accrued but unreported 2006 federal and state income tax liabilities, and no other assets or liabilities. Defendants knew that PCRG, acting through CDD Holdings, expressed no interest in acquiring any of DWC's assets except $24 million in cash. Defendants knew that, as a result of the non-competition agreement with Cintas, DWC was nothing other than a shell, so it had no business through which it could create additional assets to pay its 2006 federal income tax liability.

    c. Defendants could not have expected the funds to pay DWC's 2006 federal income taxes to come from PCRG and CDD Holdings. Defendants knew that PCRG, acting through CDD Holdings, would lose $5 million as a result of the Midco tax shelter unless DWC did not pay its 2006 income taxes. Defendants knew that no reasonable counterparty would buy DWC's stock knowing it would lose $5 million.

    d. Even the Midco tax shelter transaction documents suggested that DWC would not retain sufficient assets to pay its 2006 federal income tax liability. The Closing Procedures Agreement, for example, stated that all of DWC's cash was to be transferred directly to CDD Holdings, and, therefore, it would not be available to DWC to pay its tax liabilities.

    e. John IV knew that PCRG's "offer" was "too good to be true."

39. Defendants failed to make inquiries regarding DWC's payment of its 2006 federal income taxes. For example:

    a. John IV did not become personally familiar with CDD Holdings or PCRG and did not ask CDD Holdings or PCRG for any assurances that DWC's 2006 federal income taxes would be paid.

    b. Defendants did not ask any third parties about PCRG's history of paying acquired companies' taxes after Midco tax shelters.

9

    c.    In the Share Purchase and Sale Agreement, Defendants did not negotiate any representations or warranties from PCRG, acting through CDD Holdings, related to reporting or paying DWC's 2006 federal income tax liability, even though Defendants agreed to thirteen subparagraphs of representations and warranties related to DWC's taxes.

    d.    Defendants did not seek the advice of any tax attorneys regarding either PCRG's tax evasion strategy or their own potential liability as fraudulent transferees. In fact, the attorneys who advised Defendants regarding the Midco Tax Shelter specifically alerted Defendants that fraudulent transfers were outside the scope of their advice.

    e.    Defendants agreed to allow CDD Holdings to "solely participate in, control and resolve" "any examination, investigation, audit or other proceeding" related to DWC's 2006 income tax liabilities.

    f.    Defendants did not negotiate any agreement from PCRG, acting through CDD Holdings, that DWC would not be dissolved or liquidated within any period of time after the Midco tax shelter or that DWC would retain any particular net worth, or even remain solvent, for any length of time after the Midco tax shelter.

    g.    Defendants did not negotiate any agreement from PCRG that CDD Holdings would maintain any minimum net worth. To the contrary, CDD Holdings was a newly formed shell entity created for the sole purpose of engaging in the Midco tax shelter. CDD Holdings was incorporated in Delaware on February 6, 2006. PCRG had itself been incorporated in Delaware in November 2005.

**The Purported Stock Sale Was a Sham, as Defendants Did Not Give Up, and CDD Holdings Did Not Take, Control of DWC's Business**

40.    While DWC had sold most of its assets to Cintas, of the few assets that remained, CDD Holdings acquired none of them. For example:

10

    a.    Cintas had not purchased DWC's cash assets. In the Midco tax shelter, Defendants did not transfer control of all of DWC's cash on hand to CDD Holdings, but only sent a payment in a pre-determined amount. Defendants retained control of DWC's bank accounts with relatively minimal balances. Defendants maintained control over at least one bank account in DWC's name for several years after the Midco tax shelter.

    b.    Cintas had not purchased certain pieces of DWC's heavy equipment and vehicles, including three shredding machines, two baling machines, and a forklift. DWC's few remaining physical assets remained, and at least one room-sized shredding machine still remains, on the property owned by John IV where DWC operated and other businesses owned (in part) by Defendants still operate.

    c.    After the Midco tax shelter, Defendants retained responsibility for filing all of DWC's tax returns except its 2006 federal and state income tax returns.

41. Because Defendants retained control of all of DWC's other assets, the purported "stock sale" affected no actual transfer of control of DWC's business prospects.

**As a Consequence of the Midco Tax Shelter, DWC Became Insolvent**

42. As a result of the March 22, 2006, transfers from DWC to Defendants described above (*i.e.*, the Midco tax shelter and DWC's transfer of the Future Cintas Payments (together, the "Transfers"), DWC was rendered insolvent.

43. In substance, Defendants transferred substantially all of DWC's assets to themselves—approximately $8.4 million worth of Future Cintas Payments plus approximately $18.9 million of cash on hand—and paid a $5.34 million fee to CDD Holdings for its role facilitating the Midco tax shelter, leaving DWC incapable of paying its 2006 federal and state income tax liabilities.

44. Even in form, DWC became insolvent when, on or about April 5, 2006, it transferred approximately $23,500,000 to CDD Holdings. By April 5, 2006, DWC held less than $1 million of assets and owed over $10 million in tax liabilities.

45. Thus, the sum of DWC's debts was greater than the sum of its assets.

46. On April 17, 2006, DWC's first 2006 estimated federal income tax payment was due, but DWC did not pay it. Accordingly, starting no later than April 17, 2006, DWC was generally not paying its debts as they become due, and it is therefore presumed insolvent as of that date.

**DWC's Transfers to Defendants of the Future Cintas Payments and the Proceeds of the Midco Tax Shelter Were Fraudulent as to the United States**

47. By October 21, 2005, Defendants anticipated that DWC would owe a large federal income tax liability as a result of its gains on its sale of assets to Cintas.

48. The United States became a creditor of DWC as a result of the taxable gains DWC incurred on its sale of assets to Cintas between October 2005 and January 2006. DWC's first estimated tax payment on its capital gains tax liability was due on April 17, 2006.

49. Defendants were direct transferees of the Cintas Future Payments owed to DWC that they, as shareholders and officers of DWC, assigned to themselves.

50. As part of the Midco tax shelter, Defendants caused DWC to transfer to Defendants $18.9 million through CDD Holdings as a middle company. Because the purported "stock sale" was a sham and it lacked any non-tax economic substance and business purpose, the transfer was, in substance, from DWC to Defendants. Thus, Defendants were transferees of DWC with regard to the Midco Tax Shelter transfer.

51. Alternatively, the $18.9 million transferred to Defendants in the Midco Tax Shelter was a fraudulent transfer because Defendants were transferees-of-a-transferee, as follows:

    a. <u>DWC made a fraudulent transfer to CDD Holdings:</u> On or about April 5, 2006, DWC transferred approximately $23.5 million to CDD Holdings with actual intent to hinder, delay, or defraud the United States. Therefore, the United States, as DWC's creditor, also became a creditor of CDD Holdings (*i.e.*, the United States became a claimant against CDD Holdings for avoidance of DWC's $23.5 million fraudulent transfer to CDD Holdings to the extent necessary to

satisfy DWC's 2006 federal income tax liability). Because DWC's $23.5 million transfer to CDD Holdings was in an amount greater than the then-current balance of DWC's 2006 federal income tax liability, the United States became a creditor of CDD Holdings, which was an initial fraudulent transferee, for the full amount of DWC's 2006 federal income tax liability.

    b.    <u>CDD Holdings made a fraudulent transfer to Defendants:</u> On March 22, 2006, CDD Holdings transferred $18,885,584 to Defendants with actual intent to hinder, delay, or defraud CDD Holdings's creditors, including the United States (which was CDD Holdings's creditor as a result of the fraudulent transfer from DWC to CDD Holdings described in paragraph 51.a, immediately above). Therefore, the United States became a creditor of Defendants (*i.e.*, a claimant against Defendants for avoidance of CDD Holdings's $18.9 million fraudulent transfer to Defendants to the extent necessary to satisfy the United States' claim against CDD Holdings). Because CDD Holdings's $18.9 million transfer to Defendants was in an amount greater than the United States' claim against CDD Holdings (*i.e.*, the then-current balance of DWC's 2006 federal income tax liability), the United States became a creditor of Defendants, as transferees-of-a-transferee, for the full amount of DWC's 2006 federal income tax liability.

52.    DWC made the Transfers described above in paragraphs 28 and 30–31 with actual intent to hinder, delay, or defraud the United States, as shown by the following:

    a.    Defendants were all insiders of DWC.

    b.    The Transfers to Defendants amounted to more than substantially all of DWC's net assets.

    c.    DWC removed substantially all of its assets to Defendants and CDD Holdings.

    d.    DWC received no consideration in exchange for the Transfers to Defendants.

13

     e.    DWC was insolvent or became insolvent shortly after the Transfers to Defendants.

     f.    DWC's Transfers to Defendants were made shortly after DWC incurred substantial capital gains income and shortly before it was required to report and pay the taxes on that income.

53. DWC received nothing in exchange for the Transfers to Defendants. Therefore, the Transfers were not in exchange for reasonable value.

54. At the time of the Transfers, DWC had already incurred a capital gains tax liability, which, as shareholders and officers of DWC, Defendants knew could not be paid if DWC was rendered insolvent through the Transfers described above. The Transfers and the Midco Tax Shelter left DWC with no assets of any substantial value and more than $10 million of 2006 federal and state income taxes. DWC's assets were unreasonably small in relation to the Transfers and its 2006 federal and state income tax liabilities.

**The United States Filed Suit Against DWC**

**Within Ten Years of the Assessment of Tax**

55. On January 27, 2011, a delegate of the Secretary of the Treasury made federal income tax, penalty, and interest assessments against DWC regarding its 2006 tax liability, including a federal income tax assessment in the amount of $9,413,246.

56. As of August 17, 2020, the total unpaid balance of DWC's 2006 federal income tax liability was $26,064,832.96.

57. On October 19, 2020, the United States filed a complaint against DWC seeking to reduce to judgment DWC's unpaid 2006 assessed federal income tax liability. *See United States v. Dalton West Coast, Inc.*, No. 8:20-cv-2001 (C.D. Cal.).

58. By virtue of the filing of the United States' suit against DWC, referred to above, the time for the United States to take action to collect DWC's 2006 federal income tax liabilities under 26 U.S.C. § 6502(a) from any source was tolled.

## Count I

## Claim against John C. Dalton IV

59. The United States incorporates by reference the allegations made in paragraphs 1 through 58.

60. Because the Transfers described in paragraphs 28 and 30–31 were fraudulent as to the United States, the United States is entitled, under California law, to avoid the Transfers as to John IV to the extent necessary to satisfy DWC's 2006 federal income tax liability.

61. Portions of the Transfers from DWC totaling $26,830,584 were sent to an investment account held jointly by each of Defendants, and portions of the Transfers from DWC totaling $471,212 were sent to an investment account held solely by John IV.

62. John IV admitted that he personally received $11,830,584 from the Midco Tax Shelter and $6,020,000 from DWC's transfer of the Future Cintas Payments.

63. By reason of the foregoing, the Transfers to John IV referred to above were fraudulent transfers as to the United States and John IV is personally liable to the United States for the funds he received as a fraudulent transferee.

WHEREFORE, the United States respectfully requests that the Court enter a money judgment in its favor on Count I of the Complaint against John C. Dalton, IV in the amount of the funds he received as a fraudulent transferee, plus pre-judgment interest from the time of the transfers until the date of judgment and post-judgment interest accruing thereafter; and grant the United States its costs and such other and further relief as the Court deems just and proper.

## Count II

## Claim against John C. Dalton V

64. The United States incorporates by reference the allegations made in paragraphs 1 through 58.

65. Because the Transfers described in paragraphs 28 and 30–31 were fraudulent as to the United States, the United States is entitled, under California law, to avoid the Transfers as to John V to the extent necessary to satisfy DWC's 2006 federal income tax liability.

66. Portions of the Transfers from DWC totaling $26,830,584 were sent to an investment account held jointly by each of Defendants.

67. John V's agent told the California Franchise Tax Board that John V personally received $5,948,959 from the Midco Tax Shelter and $2,740,882 from DWC's transfer of the Future Cintas Payments.

68. By reason of the foregoing, the Transfers to John V referred to above were fraudulent transfers as to the United States and John V is personally liable to the United States for the funds he received as a fraudulent transferee.

WHEREFORE, the United States respectfully requests that the Court enter a money judgment in its favor on Count II of the Complaint against John C. Dalton, V in the amount of the funds he received as a fraudulent transferee, plus pre-judgment interest from the time of the transfers until the date of judgment and post-judgment interest accruing thereafter; and grant the United States its costs and such other and further relief as the Court deems just and proper.

## Count III
### Claim against Matthew J. Dalton

69. The United States incorporates by reference the allegations made in paragraphs 1 through 58.

70. Because the Transfers described in paragraphs 28 and 30–31 were fraudulent as to the United States, the United States is entitled, under California law, to avoid the Transfers as to Matthew to the extent necessary to satisfy DWC's 2006 federal income tax liability.

71. Portions of the Transfers from DWC totaling $26,830,584 were sent to an investment account held jointly by each of Defendants.

72. Matthew's agent told the California Franchise Tax Board that John V personally received $5,948,959 from the Midco Tax Shelter and $2,740,882 from DWC's transfer of the Future Cintas Payments.

73. By reason of the foregoing, the Transfers to Matthew referred to above were fraudulent transfers as to the United States and Matthew is personally liable to the United States for the funds he received as a fraudulent transferee.

WHEREFORE, the United States respectfully requests that the Court enter a money judgment in its favor on Count III of the Complaint against Matthew J. Dalton in the amount of the funds he received as a fraudulent transferee, plus pre-judgment interest from the time of the transfers until the date of judgment and post-judgment interest accruing thereafter; and grant the United States its costs and such other and further relief as the Court deems just and proper.

Dated: January 22, 2021

> DAVID A. HUBBERT
> Deputy Assistant Attorney General,
> Tax Division
> TRACY WILKINSON
> Acting United States Attorney
> THOMAS D. COKER
> Assistant United States Attorney
> Chief, Tax Division
>
> */s/ Gregory L. Mokodean*
> GREGORY L. MOKODEAN
> HARRIS J. PHILLIPS
> Trial Attorneys, Tax Division
> U.S. Department of Justice
> Attorneys for the United States of America